STATE OF VERMONT

| SUPERIOR COURT | ENVIRONMENTAL DIVISION |

| | |
|---|---|
| Diverging Diamond Interchange SW Permit | Docket No. 50-6-16 Vtec |
| Diverging Diamond Interchange A250 | Docket No. 169-12-16 Vtec |

**Decision on Motions for Summary Judgment**

In Docket No. 50-6-16 Vtec, RL Vallee, Inc. appeals Individual Stormwater Discharge Permit No. 6946-INDS, issued on May 11, 2016 by the Vermont Agency of Natural Resources to the Vermont Agency of Transportation for the Diverging Diamond Interchange proposed at Interstate 89, Exit 16 (the SW Permit).

In Docket No. 169-12-16 Vtec, RL Vallee, Inc. and Timberlake Associates, LLC appeal Act 250 permit #4C1271 and permit amendments #4C0676R-16, #4C0288-21, #4C0757-24, and #4C0471-7, issued jointly on November 28, 2016 by the District #4 Environmental Commission to the Vermont Agency of Transportation for the construction of the Diverging Diamond Interchange and related improvements (the Act 250 permit).  Land Use Permit # 4C1271 Findings of Fact, Conclusions of Law, and Order (Dist. #4 Envtl. Comm. Nov. 28, 2016).

Both matters are now before the Court on multiple summary judgment motions.

The Vermont Agency of Transportation (VTrans), represented by Justin E. Kolber, Esq. and John K. Dunleavy, Esq., and the Agency of Natural Resources (ANR), represented by Leslie A. Welts, Esq. and Hannah W. Smith, Esq., move for summary judgment on Amended Questions 1, 3, 6–8, and 11–18 in the SW Permit appeal.

RL Vallee, Inc. (Vallee), represented by Jon T. Anderson, Esq. and Alexander J. LaRosa, Esq., moves for summary judgment in the Act 250 appeal on its Questions 5, 6, and 11, and in the SW Permit appeal on Amended Questions 9 and 10.  VTrans filed an opposition to Vallee's motion, along with a cross motion for summary judgment on these same questions.

The Conservation Law Foundation (CLF), represented by Elena M. Mihaly, Esq., filed a memorandum in the SW Permit appeal opposing ANR's and VTrans' motions for summary

judgment on Amended Questions 3, 7, and 8, and supporting Vallee's motion on Amended Questions 9 and 10.

The Natural Resources Board (NRB), represented by Peter J. Gill, Esq., filed a memorandum in the Act 250 appeal opposing Vallee's motion and supporting VTrans' cross motion on Question 11.

Timberlake Associates, LLP (Timberlake), represented by David L. Grayck, Esq., and Costco Wholesale Corp. (Costco), represented by Mark G. Hall, Esq., have made no filings on the pending motions.

### Standard of Review

We grant summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a). When considering a motion for summary judgment, we give the nonmoving party the benefit of all reasonable doubts and inferences. Robertson v. Mylan Labs., Inc., 2004 VT 15, ¶ 15, 176 Vt. 356. Once the moving party meets the initial burden of showing no material facts are disputed, the burden shifts to the non-moving party to establish a triable issue of fact. Pierce v. Riggs, 149 Vt. 136, 138 (1987). In order to establish that a fact is disputed or unsupported by the record, the non-moving party must cite to materials on the record or show that the materials cited by the moving party do not establish the absence of a genuine dispute. V.R.C.P. 56(c). When considering cross motions for summary judgment, each party is entitled to the benefit of reasonable doubts and inferences when considered as the non-moving party. Vermont Coll. of Fine Arts v. City of Montpelier, 2017 VT 12, ¶ 7 (Vt. Feb. 10, 2017) (citation omitted).

### Motion for Summary Judgment on Stormwater Appeal Amended Questions 1, 3, 6, 7, 8

ANR and VTrans move for summary judgment on Amended Questions 3, 7, and 8, which address chloride management.[1] ANR and VTrans argue that the issues presented in these

---

[1] Amended Question 3 asks whether VTrans' chloride management plan adequately ensures that chloride discharges to Sunnyside Brook will not reduce the quality of Sunnyside Brook below the classification established and/or that the discharges will not further the non-compliance of Sunnyside Brook with the Vermont Water Quality Standards.

Amended Question 7 asks whether construction should be conditioned to require measures to control chloride discharges into Sunnyside Brook to ensure that the brook meets and/or maintains compliance with the VWQS.

2

Questions are not relevant because the permit application vested in the 2011 Vermont Water Quality Standards, which do not include a chloride standard, and because no other legal authority required specific measures for chloride management at that time. Vallee and CLF contend that the application vested in the 2014 Vermont Water Quality Standards, which do contain a chloride standard.

ANR and VTrans also move for summary judgment on Amended Questions 1 and 6, which deal with phosphorus management.[2] As to Amended Question 1, ANR and VTrans contend that the application is vested in regulations that predate the Lake Champlain phosphorus total maximum daily load (TMDL) and the TMDL therefore does not apply. As to Amended Question 6, ANR and VTrans submit that there is no rule or regulation requiring VTrans to eliminate its phosphorus discharge. Vallee and CLF do not respond to the motions for summary judgment on these Questions.

I. **Undisputed Material Facts: Amended Questions 1, 3, 6, 7, 8**

The following facts, and all undisputed material facts set out in this decision, are based on the record now before us and are set out solely to rule on the pending summary judgment motions.

**Background**

1. VTrans proposes a project that involves building a Diverging Diamond Interchange at Interstate 89, Exit 16, in the Town of Colchester, and related improvements to U.S. Route 2/7 in the immediate vicinity of Exit 16 (the Project).

2. The Project is in the Sunnyside Brook watershed.

---

Amended Question 8 asks whether the Project adequately addresses chloride contamination from stormwater.

[2] Amended Question 1 asks whether the Lake Champlain total maximum daily load (TMDL) allows VTrans to increase phosphorus loading into Lake Champlain.

Amended Question 6 asks whether it is feasible for VTrans to ensure there is no net increase in phosphorus discharges through onsite stormwater treatment.

3.      The Project requires an Individual Stormwater Discharge Permit (SW Permit), pursuant to 10 V.S.A. § 1264 and the Stormwater Management Rule, Chapter 18 of the Environmental Protection Rules.[3]

**Standards and Regulations**

4.      Stormwater discharge permit applications are reviewed for compliance with the Vermont Water Quality Standards (VWQS).

5.      On December 30, 2011, a revised version of the VWQS went into effect (the 2011 VWQS). The 2011 VWQS do not include any specific criteria for chloride. 2011 VWQS, Appendix C.

6.      On October 30, 2014, another revised version of the VWQS went into effect (the 2014 VWQS). The 2014 VWQS include criteria for chloride. 2014 VWQS, Appendix C.

7.      On September 30, 2014, ANR's Department of Environmental Conservation (DEC) issued a List of Impaired Waters approved by the United States Environmental Protection Agency (EPA) pursuant to section 303(d) of the federal Clean Water Act (the 2014 303(d) list). The 2014 303(d) list does not include Sunnyside Brook as an impaired water.

8.      The EPA approved an updated 303(d) list on September 7, 2016 (2016 303(d) list). The 2016 303(d) list includes Sunnyside Brook as a chloride-impaired water in need of a TMDL for chloride. Vermont has not yet proposed a TMDL for chloride in Sunnyside Brook, and the brook remains classified as a Class B water.

9.      In October 2014, the Vermont segments of Lake Champlain did not have a TMDL for phosphorus.

10.     On October 1, 2015, DEC adopted an interim procedure under Act 64 that required no net increase in phosphorus loading to waters within Lake Champlain basin for stormwater discharge permits applied for on or after October 1, 2015.

11.     On June 17, 2016, the EPA established a new phosphorus TMDL for the Vermont segments of Lake Champlain.

**The Permit Application**

12.     On February 13, 2013, VTrans filed a SW Permit application with ANR.

---

[3] The Stormwater Management Rule was amended in 2017; prior to that, the 2011 rule controlled. The 2011 rule is available at http://dec.vermont.gov/sites/dec/files/documents/wsmd-sw-rule-unimpaired-2011-03-15_0.pdf.

13. ANR sent a letter to VTrans dated February 15, 2013 indicating that the application had been received, and noting that the letter did not serve as notice of determination of whether or not the application was complete.[4]

14. VTrans filed a revised SW Permit application with ANR on October 3, 2014.

15. The application begins with a Notice of Intent (NOI) form, which is filled out with the name of the applicant, address and contact information, project name and location, number of discharge points, receiving waters, and other general information. Vallee Opp. to ANR and VTrans Mot. Summ. J., Ex. H.

16. Paragraph 16 of the NOI form states: "[t]he following items <u>must</u> be included in your application materials for your application to be considered complete." The form goes on to list a series of items, including "Narrative," "Schedule As and Standard Treatment Practices (STPs) / Credit worksheets," "Maps / Site Plans," "Runoff Modelling (where applicable)," and "Additional Supporting Information." Many of these items include lists of sub-items. There are boxes for the applicant to check off next to each item and sub-item. On VTrans' application, all of the boxes are checked off except those for "Runoff Modelling (where applicable)" and "Additional Supporting Information."

17. Also on October 3, 2014, an ANR employee, Jenna Calvi, wrote to others at ANR informing them that the application had been received from VTrans. The email notes that "[t]he project is <u>not yet administratively complete</u> but I will be taking a look at the application materials at my earliest convenience" (emphasis in original). Vallee Opp. to ANR and VTrans Mot. Summ. J., Exh. B.

18. A screenshot purportedly from the ANR website with the number 6946-INDS states: "Application Received: 02/13/2013," "Admin Complete: 10/06/2014," "Tech Complete: 02/17/2015," "Public Notice Start: 02/19/2016."

---

[4] Vallee submits that the letter was mistakenly dated February 15, 2013, but does not explain the alleged mistake. ANR, in its statement of material facts, asserts that the application was filed February 13, 2013, and Vallee does not challenge this. If this filing date is correct, then it is reasonable to assume ANR would respond two days later, on February 15, 2013. Regardless, the precise dates of the initial application and response letter are not material to our ruling here.

19.     Ms. Calvi sent a letter to Michael LaCroix at VTrans dated October 16, 2014. In the letter, Ms. Calvi states that she has conducted her initial technical review of the application, and that she is requesting additional information. The letter includes ten specific requests for VTrans to update application materials, provide additional information, and clarify parts of the application that are unclear.

20.     On October 17, 2014, counsel for ANR sent an email to counsel for VTrans stating that an upcoming hearing on Act 250 Criterion 1B for the Project should be postponed because of the issues outlined in the October 16, 2014 letter. The email also states that ANR would ask VTrans to develop a chloride management plan. In a reply email, counsel for VTrans agreed to postpone the Act 250 hearing.

21.     In a memo issued October 29, 2014, the District #4 Coordinator announced that the upcoming Act 250 hearing would be postponed until the applicant informed the District Coordinator "that ANR has accepted the stormwater application as complete." Vallee Opp. to ANR and VTrans Motion for Summary Judgment, Ex. E.

22.     In a November 4, 2014 email, counsel for ANR told counsel for VTrans that while VTrans planned to provide information to address the issues set out in the October 16, 2014 letter, doing so "might not result in a final complete application because there may need to be further requests for information and revisions to the stormwater application after that." Vallee Opp. to ANR and VTrans Motion for Summary Judgment, Ex. F.

23.     On January 13, 2015, Mr. LaCroix sent a revised stormwater application on behalf of VTrans to Ms. Calvi at ANR. The cover letter to the revised application lists a number of "items in the application [that] have been revised to comply with the comments received by [Ms. Calvi] on October 16, 2014." Vallee Opp. to ANR and VTrans Motion for Summary Judgment, Ex. G.

24.     Among other things, the January 13, 2015 revisions list the landowners from whom land would be acquired for the Project (cover page at 1); includes a Chloride Management Plan as an appendix to the Application (cover page at 2); and adds the site balancing approach to the proposed stormwater collection system (narrative at 4).

25.     VTrans submitted further revisions to its application on March 4, 2015, June 15, 2015, and October 17, 2015. Vallee Opp. to ANR and VTrans Mot. Summ. J., Ex. M.

26.     ANR put a draft stormwater discharge permit for the Project on public notice in February 2016.

27.     On May 11, 2016, ANR approved the stormwater permit application and issued VTrans Individual Stormwater Discharge Permit No. 6946-INDS (the SW Permit).

## II.     Discussion: Amended Questions 1, 3, 6, 7, 8

ANR and VTrans argue that the permit application vested when ANR deemed it administratively complete on October 6, 2014.  As such, they submit that the application is subject to the 2011 VWQS and the 2014 303(d) list.  Vallee and CLF argue in their pleadings and through Vallee's Questions that the application vested after October 30, 2014, and so is subject to the 2014 VWQS, the 2016 303(d) list, the October 1, 2015 interim procedure calling for no net increase in phosphorus loading to waters within Lake Champlain basin from stormwater permits, and the new phosphorus TMDL for the Vermont segments of Lake Champlain.

Generally, a permit applicant's rights vest in the laws that exist at the time the permit application is submitted.  Smith v. Winhall Planning Comm'n, 140 Vt. 178, 180–81 (1981); VWQS 12-004-052 Vt. Code R. § 1-01(A)(2) (2011) ("[c]oncerning any application, the Water Quality Standards in effect at the time of filing apply").

To determine when the SW Permit application at issue in this case vested, we find it useful to review some principles and practices that apply to the stormwater permit application review process.  First, we note that ANR conducts a two-step review: the first step to determine if an application is administratively complete, the second step to weigh the technical merits of the application.  Second, an application is administratively complete when it includes all of the elements required by ANR to review its merits.  Third, once an application is determined to be administratively complete, that application vests retroactively back to the date that it was submitted to ANR.  And fourth, technical review involves a back-and-forth, iterative process between ANR and the applicant that does not extinguish the vesting date.

This understanding of the review and vesting process is largely consistent with ANR's own practice.  See ANR Mot. Part. Summ. J. at 13–14; In re ANR Permits in Lowell Mountain Wind Project, 2014 VT 50, ¶ 15, 196 Vt. 467 (giving "substantial deference" to an agency's interpretation of its own regulations).

7

### a. ANR conducts a two-step review of stormwater permit applications.

ANR reviews stormwater permit applications in two steps. First, ANR determines whether the application is administratively complete. If the application is administratively complete, ANR then conducts a technical review of the application on its merits and decides whether it should be approved, denied, or modified.

The Water Resources Board alluded to this two-step process in <u>Re: Hannaford Bros. Co. and Lowes Home Centers, Inc.</u>, No. WQ-01-01, Mem. of Decision at 11 (Vt. Wat. Res. Bd. June. 29, 2001). In that case, the Board explained that a stormwater permit application is complete for purposes of vesting when it "reasonably address[es] all the factors that the agency is legally required to address in its permit review," and "the application is such that the applicant would reasonably believe that the reviewing authority could act upon the application's merits." <u>Id</u>. This suggests that there is a review for completeness separate from, and preceding, technical review of the application's merits.

ANR guidelines also refer to a two-step process. See the Vermont Stormwater Management Manual (VSMM) Application Requirements for Operational Permits (referring to "administrative review" at 1.1 and "technical review" at 7.2); DEC website on "Operational State Stormwater Permit Application Materials" ("An application will be considered administratively incomplete and will not proceed onto [sic] technical review unless all of the items listed on the NOI form, and all of the required worksheets for any STP or waivers listed are included." http://dec.vermont.gov/watershed/stormwater/permit-information-applications-fees/operational-stormwater-discharge-permit-application-materials (last accessed on October 10, 2017).[5]

### b. An application is administratively complete if all required components are included.

ANR does not specifically define administrative completeness. We are guided, however, by case law and ANR rules and policies to conclude that an application is administratively

---

[5] While the website and VSMM Application Requirements document may have been produced after the permit application at issue here vested, we find them useful in illustrating how ANR carries out the permit review process.

complete when it includes all components normally required in an application, such that ANR is able to review the merits of the application.

Generally, a permit applicant's rights vest in the laws that exist at the time the permit application is submitted. Smith v. Winhall Planning Comm'n, 140 Vt. 178, 180–81 (1981); VWQS 12-004-052 Vt. Code R. § 1-01(A)(2) (2011) ("[c]oncerning any application, the Water Quality Standards in effect at the time of filing apply"). To vest, the application must be "full and complete." In re Keystone Dev. Corp., 2009 VT 13, ¶ 5, 186 Vt. 523 (mem.) (citing Winhall, 140 Vt. at 182). Rights may not vest if an incomplete application is submitted as a vague placeholder, or in bad faith, to avoid pending unfavorable changes to regulations. See In re Taft Corners Assocs., Inc., 171 Vt. 135, 142 (2000) (citing In re Ross, 151 Vt. 54, 56 (1989)).

This completeness requirement is alluded to in the VWQS, which define "application," as "any request for a permit required by state or federal law when filed with, and deemed complete by, the reviewing authority." 2011 VWQS § 1-01(B)(4). While the VWQS do not define "deemed complete," the plain language of the phrase suggests a process where the agency reviews the application for completeness. As explained above, administrative completeness necessarily precedes technical review by providing all of the elements necessary to review the application's merits. Hannaford Bros., No. WQ-01-01 at 11 (June. 29, 2001).

The elements required to review an operational stormwater permit application are set out on the Notice of Intent (NOI) form submitted by VTrans on October 3, 2014. The form states: "The following items must be included in your application materials for your application to be considered complete," and lists a number of items. On VTrans' SW Permit application, all of the required items are checked off.[6] There is no information on the record suggesting that any

---

[6] ANR regulations and publications call for similar elements for operational stormwater permits. E.g., DEC website on "Operational State Stormwater Permit Application Materials" (applications must include a notice of intent (NOI), Narrative, Workbook, Worksheets, Modeling, and Plans); 2017 Vermont Stormwater Management Manual (calling for similar components) ; the Vermont Stormwater Management Manual (VSMM) Application Requirements for Operational Permits (same); and the ANR Permit Application Review Procedure (as cited in Re: Rapid Rubbish Removal, Inc., Interim Certification No. CA-721-WFP, Findings of Fact, Conclusions of Law, and Order at *6 (Vt. Env. Bd., Waste Facility Panel, Jun. 12, 1997) 1997 WL 379923) (same).

required item set out on the application form was not submitted.[7]  On its face, then, the application appears to include all required components.

On October 3, 2014, Ms. Calvi stated in an internal ANR email that the application was not yet administratively complete, but that she was going to look at the application materials at her earliest convenience.  This suggests that she was going to conduct an initial review of the application to determine if it was administratively complete.

There is some evidence on the record indicating that ANR deemed the application complete on October 6, 2014.  ANR's motion for summary judgment includes an affidavit by an environmental analyst for the agency's stormwater program stating that he reviewed the application materials, correspondence, and documentation related to this permit application, and determined that the application was deemed complete on October 6, 2014.  VTrans also refers to what appears to be a screenshot of ANR's records indicating that the application was administratively complete on October 6, 2014.  Vallee challenges this on foundational grounds, because VTrans does not offer an affidavit by someone with personal knowledge explaining what the screenshot shows.   If we give weight to any of these items, it would be to the analyst's offer that the application was deemed complete on October 6, 2014.

Ms. Calvi states in her October 16, 2014 letter that she had begun her initial technical review of the application, and she had some comments and requests for additional information based on that review.   Again, an application must be administratively complete in order to move on to technical review.  Hannaford Bros., No. WQ-01-01 at 11 (June. 29, 2001).  Because Ms. Calvi began her technical review before October 16, 2014, the application must have been administratively complete before that time.

In her October 16, 2014 letter, Ms. Calvi asked VTrans to submit a list of all owners of impervious surfaces associated with the Project, including those whose property VTrans planned to obtain through eminent domain.  In his January 13, 2015 response, Mr. LaCroix explained that VTrans would be purchasing some of the land to be used in the Project, and gave a list of landowners from whom land would be purchased.  Pointing to this, Vallee contends that the

---

[7] Such information should be distinguished from additional information submitted by VTrans as part of the technical review process, discussed below.

October 3, 2014 application was not complete because it did not include a list of all owners of impervious surfaces associated with the Project in violation of Stormwater Management Rule § 18-309(b)(2). That rule states:

> The applicant shall own or control the impervious surfaces for which permit coverage is required. If the applicant merely controls the impervious surfaces, the owner of the impervious surfaces shall be a co-applicant, unless the applicant that controls the impervious surface is a municipality or stormwater utility that has assumed responsibility for the management of discharges of regulated stormwater runoff from the impervious surfaces.

16-3 Vt. Code. R. § 505:18-309(b)(2).

The failure to include this list in the October 3, 2014 application neither violated § 18-309(b)(2), nor rendered the application incomplete. The rule states that the applicant shall own all impervious surfaces, but is silent regarding when the surfaces must come into the applicant's ownership. The Rule does not require this information to be included in the application for that application to be considered complete. VTrans explained on January 13, 2015 that it would control all surfaces covered by the permit; this is presumably why other property owners were not listed as co-applicants. There is also no indication that this information was necessary to begin a technical analysis of the proposed project.

We conclude that the absence of this information in the October 3, 2014 application did not render the application incomplete for vesting purposes.

### c. The vesting date is retroactive to the date a complete application was submitted

Rights vest in the laws and regulations in effect "as of the time when [a] proper application is **filed**." Winhall, 140 Vt. at 181 (emphasis added). Where the application review process involves an initial step, as here, in which the permitting agency reviews the application for completeness, the permit vests on the date that the complete application was filed, not on the date the agency deems the application complete. Hannaford Bros., No. WQ-01-01 at 13 (June. 29, 2001) (agreeing with "ANR's practice of protecting the vested rights of permit applicants by retroactively deeming applications complete as of the date the applications were complete in fact."); 2011 VWQS § 1-01(A)(2) ("[c]oncerning any application, the Water Quality Standards in effect **at the time of filing** apply") (emphasis added).

11

VTrans submitted the application on October 3, 2014, and no changes were made to that submission before Ms. Calvi began her technical review.  The application must therefore have been administratively complete when it was submitted October 3, 2014.

Vallee argues for a later vesting date, pointing to § 18-309(d)(2) of the Stormwater Management Rule.  That section reads as follows:

(d)  Public Notice and Hearing for Applications for an Individual Stormwater Discharge Permit

(1) If the Secretary determines that an application for an individual stormwater discharge permit is complete, the Secretary shall prepare a draft stormwater discharge permit and shall provide notice to the clerk of the municipality in which the discharge is located, on the Environmental Notice Bulletin, and to a list of interested persons, if any.

(2) The Secretary shall provide thirty (30) days from completion of the public notice requirements in subsection 309(d)(1) of this section for persons to submit written comments on the application and the draft stormwater discharge permit.

16-3 Vt. Code. R. § 505:18-309(d)(2).

Vallee reads this section to mean that "the date the application is deemed complete is the date it is put on public notice."  Vallee's Response to VTrans SOMF ¶ 3.

The plain language of the rule does not support this interpretation.  In re CVPS/Verizon Act 250 Land Use Permit Numbers 7C1252 & 7C0677-2, 2009 VT 71, ¶ 26, 186 Vt. 289 (courts interpret regulations according to their plain language).  Nothing in the rule states that an application is incomplete until notice is provided.  Rather, the rule states that notice should be given *after* the application is deemed complete, indicating that completeness precedes notice. The rule does not specify a timeline between determining that an application is complete, and giving notice.

Based on the rule's plain language, we disagree with Vallee's argument that an application is not complete until it is put on notice.

### d. Changes can be made during technical review without extinguishing the vesting date.

Vallee and CLF argue that VTrans' October 3, 2014 application was superseded by an application submitted January 13, 2015, and that the earliest the application could vest is on the date that the later application was submitted.

If an applicant withdraws an application and submits a new application, vesting rights in the original application are extinguished, and the applicant vests in the laws and regulations in effect at the time the new application is filed.  In re Times & Seasons, LLC, 2011 VT 76, ¶ 16, 190 Vt. 163; In re John A. Russell Corp., 2003 VT 93, ¶ 13, 176 Vt. 520 (mem.).  Submitting a complete application and then adjusting that application during the technical review process, however, does not necessarily extinguish the rights that vested at the time the complete application was filed.

The rules and ANR documents related to stormwater permit applications expressly contemplate an iterative technical review process in which ANR may request additional information, or changes, to a proposed project.

For example, Stormwater Management Rule § 18-309(c): provides that:

> [t]he Secretary may require an applicant to submit additional information that the Secretary considers necessary in order to make a decision on the issuance or denial of an individual permit.  The Secretary may deny the individual permit if the requested information is not provided within sixty (60) days of the Secretary's request.

16-3 Vt. Code. R. § 505:18-309(c).  Stormwater Management Rule § 18-309(f) further provides that certain changes can be made to a project after the public comment period, and prior to issuance of the final permit, without re-noticing for public comment.  Id. § 18-309(f).

The 2017 VSMM Application Requirements for Operational Permits, at section 1.2, explains that:

> Submission of permit-application related correspondence (e.g. response to technical review comments, plan changes, application material revisions) is requested via email following the initial submittal of the application. If revisions to original application materials are requested by the Stormwater Program, it is expected that a complete attachment will be re-submitted with the response to comments.

The Water Resources Board has likewise explained that:

> It is safe to say that agencies reviewing complex permit applications commonly ask for supplemental information.  Such a request should not necessarily be the death knell for applying the law in effect when the application was originally presented to the agency. The agency should not be discouraged from requesting appropriate additional information, and the applicant should not be encouraged to bury the agency with extraneous information in the hope of preventing the

agency from divesting the applicant of its rights by asking for something else. That is why a reasonable-expectation rule, rather than a perfect-application rule, is appropriate. Good faith requires that a complete application reasonably address all the factors that the agency is legally required to address in its permit review. ANR's completeness determinations should be made accordingly.

Hannaford Bros., No. WQ-01-01 at 11 (June. 29, 2001).

A similar principle applies to permit applications outside of the stormwater permit context. See, e.g., In re Jolley Assocs., 2006 VT 132, ¶ 16, 181 Vt. 190; In re Times & Seasons, LLC, 2011 VT 76, ¶ 11, 190 Vt. 163.

There is a strong policy argument to allow permit applicants to adjust and revise their applications during the application review process. Land use permit applications can be complex, and are often subject to revision as they are shepherded through the review process. It is impractical to have any small change trigger a new vesting event, which could require a review of the entire application under entirely new laws or regulations.

For these reasons, we disagree with Vallee that revisions to the permit application made after the October 3, 2014 submission extinguished the rights vested by the submission of a complete application on October 3, 2014.

### III.    Conclusion

Based on the record now before us, and for the reasons set out above, we conclude that the SW Permit application was administratively complete, and vested in the laws and regulations in existence, when it was submitted by VTrans on October 3, 2014.[8]   The application therefore vested in regulations without chloride standards. For this reason, ANR's and VTrans' motions for summary judgment on Amended Questions 3, 7, and 8, which deal with chloride management, are **GRANTED**. Because the application vested in laws that predate phosphorus limitations, ANR's and VTrans' motions for summary judgment on Amended Questions 1 and 6, which deal with phosphorus management, are also **GRANTED**.

---

[8] It is possible that the application was administratively complete February 13, 2013. Because the parties have not submitted any information to the Court on the substance of the application submitted on that date, or regarding changes made from the February 13, 2013 application to the October 3, 2014 application, we infer, in favor of the non-moving party, that the February 2013 application was administratively incomplete, and subsequent changes made the October 2014 application administratively complete.

**<u>Motion for Summary Judgment on Stormwater Appeal Amended Questions 11–18</u>**

Amended Questions 11–18 raise issues related to the relationship between the stormwater permit and a municipal separate storm sewer system (MS4) permit.

ANR and VTrans move for summary judgment on these questions, arguing that no legal authority requires the stormwater permit to comply with the MS4 permit. Vallee responds that compliance is required pursuant to Stormwater Management Rule § 18-306(a)(3). Alternatively, Vallee contends that there is ambiguity in determining whether § 18-306(a)(3) requires compliance with the MS4 permit such that summary judgment is not warranted.

## I. Undisputed Material Facts: Amended Questions 11–18

1. A municipal separate storm sewer system is a system of conveyances used for collecting or conveying stormwater; it is not a combined sewer system or part of a publicly owned treatment system.

2. Small Municipal Separate Storm Sewer System General Permit No. 3-9014 (2003) (the MS4 General Permit) regulates stormwater discharges from small municipal separate storm sewer systems in urbanized areas in Vermont.

3. VTrans is an operator of a "non-traditional" municipal separate storm sewer system subject to regulation under the MS4 General Permit within several urbanized areas, including the Town of Colchester.

4. On October 1, 2013, ANR authorized VTrans to discharge under the MS4 General Permit. This decision was not appealed.

## II. Discussion: Amended Questions 11–18

Vallee contends that Stormwater Management Rule § 18-306(a)(3) requires the SW Permit on appeal in this docket to comply with the terms of the MS4 general permit. That rule reads in relevant part as follows:

> (a) For discharges of regulated stormwater runoff to waters that are not stormwater-impaired waters, the Secretary shall require that:
>
> . . .
>
> (3) Previously permitted existing stormwater discharges obtain an individual permit or coverage under a general permit that provides that existing discharges that have been previously authorized by the Secretary shall meet the treatment

requirements in the most recently issued permit unless the approved stormwater system was never built or has substantially deteriorated. If the system was never built or has substantially deteriorated, [ANR] shall require that the permittee conduct an engineering feasibility analysis acceptable to [ANR] and construct a stormwater management system to meet, or to meet as closely as possible, the treatment standards for new development in the [VSMM] . . . .

16-3 Vt. Code. R. § 505:18-306(a)(3).

Vallee contends that the language of subsection (3)—such as "[p]reviously permitted existing stormwater discharges," "the most recently issued permit," and "existing discharges that have been previously authorized by the Secretary"—implicate the MS4 General Permit. Thus, Vallee submits, a stormwater permit issued pursuant to the Stormwater Management Rule must comply with and conform to the terms of the previously approved MS4 General Permit.

VTrans and ANR disagree, arguing that subsection (3) refers only to stormwater permits issued pursuant to 10 V.S.A. §§ 1263–64, and not to those issued pursuant to 10 V.S.A. § 1258, like the MS4 General Permit.

We approach regulatory construction by applying the rules of statutory construction, with the overall goal of discerning the intent of the drafters. In re Williston Inn Grp., 2008 VT 47, ¶ 14, 183 Vt. 621 (citations omitted). When possible, we discern intent based on the rule's plain language. Id. (citing Slocum v. Dep't of Soc. Welfare, 154 Vt. 474, 478 (1990)). If the plain language is ambiguous, we turn to other tools of statutory construction, and also give weight to the agency's interpretation of the rule. Slocum, 154 Vt. at 478.

Section 18-306(a)(3) does not expressly state whether "previously permitted existing stormwater discharges" and "existing discharges that have been previously authorized by the Secretary" are limited to permits issued pursuant to 10 V.S.A. § 1263–64, or whether they include permits issued pursuant to 10 V.S.A. § 1258, such as the MS4 General Permit.

Where, as here, the plain language of one subsection of a regulation "is insufficient guidance to ascertain [the drafters'] intent, we look beyond the language of a particular section standing alone to the whole [rule], the subject matter, its effects and consequences, and the reason and spirit of the law." State v. Thompson, 174 Vt. 172, 175 (2002) (citing In re Wal*Mart Stores, Inc., 167 Vt. 75, 84 (1997)).

We begin this analysis here with the legislative mandate that ANR:

16

shall implement two stormwater permitting programs. The first program is based on the requirements of the federal National Pollutant Discharge Elimination System (NPDES) permit program in accordance with [10 V.S.A. § 1258]. The second program is a State permit program based on the requirements of this section for the discharge of "regulated stormwater runoff" as that term is defined in subdivision (11) of this subsection.

10 V.S.A. § 1264(a) (2014).[9]

The "first program" identified in this statute refers to that implemented through § 1258, which authorizes ANR to issue NPDES permits, pursuant to federal law, which "are consistent with meeting the objectives of the Vermont Water Pollution Control Program."   10 V.S.A. § 1258(b).   The MS4 General Permit was issued pursuant to this first, federal stormwater permitting program.  See R.L. Vallee, Inc. et al. MS4, No. 122-10-16 Vtec (Vt. Super. Ct. Envtl. Div. May 2, 2017) (Walsh, J.).  The "second program" is set out in § 1264, which authorizes ANR to issue stormwater discharge permits consistent with the VSMM.  Id. § 1264(e).  The SW Permit on appeal in this docket was issued pursuant to this second, state stormwater permitting program. SW Permit at 1.

Section 1264 mandates ANR to initiate rulemaking to administer this second, state stormwater permitting program.  Id. § 1264(d)(1).[10]  The Stormwater Management Rule was adopted pursuant to this mandate.  16-3 Vt. Code. R. § 505:18-102.   The Rule states that it does not apply to the issuance of NPDES permits issued under § 1258.  Id. § 18-301(c)(2).

As a general proposition, then, ANR administers two distinct stormwater permitting programs.   The question here is whether § 18-306(a)(3) is intended to tie these programs together by requiring state stormwater permits to conform to federal stormwater permits.

We can infer the intent of subsection (3) by reading the three subparts of § 18-306(a) together.  Richards v. Nowicki, 172 Vt. 142, 149 (2001) ("We must read the sections of the regulatory scheme in context and the entire scheme in pari materia.") (citation omitted).  Under subpart (1), discharges of regulated stormwater runoff from new development and expansions

---

[9] This statute was amended by 2015, No. 64, § 31, which went into effect on July 1, 2015, and October 1, 2015.  Because, as explained above, the SW Permit vested in the laws in effect as of October 3, 2014, we apply the 2014 version of 10 V.S.A. § 1264.

[10] The statute goes on to authorize ANR to issue general permits consistent with 10 V.S.A. § 1263(b).  10 V.S.A. § 1264(e)(2) (2014)

must obtain a permit consistent with the standards for *new development* set out in the Vermont Stormwater Management Manual (VSMM). § 18-306(a)(1). Under subpart (2), discharges of regulated stormwater runoff from *redeveloped* impervious surfaces must obtain a permit consistent with the standards for *redevelopment* set out in the VSMM. § 18-306(a)(2). Under subpart (3), *previously permitted existing stormwater discharges* must obtain a permit that meets the requirements set out in the *most recently issued discharge permit*. § 18-306(a)(3).

Under ANR's reading, subpart (3) grandfathers the standards that applied in the previous permit into the new permit. If, however, the previously permitted system was never built or has deteriorated, ANR must determine whether it is feasible (through an engineering analysis) to construct a new stormwater management system that complies with the standards for *new development* set out in the VSMM.

This is a logical reading of the rule. Lowell Mountain, 2014 VT 50, ¶ 15 (calling for deference to agency interpretation of its own rule). The Stormwater Management Rule allows a person to design a stormwater system that complies with the controlling standards, obtain a permit for that system, and then build it. The permit, however, may expire at some point, requiring the permittee to reapply for a new permit. § 18-307(d) (providing that general permit shall be for no more than five years); § 18-309(k)(1) (providing for renewal of individual discharge permit after expiration). If the controlling standards have changed such that the existing stormwater system does not comply with the new standards, requiring the permittee to rebuild the system to comply with the new standards could impose a heavy burden. Under ANR's reading of the rule, § 18-306(a)(3) lifts this burden by allowing the existing system to remain in place if it continues to comply with the standards under which it was originally approved.

This reading also comports with the principles underlying our law on vested rights, discussed above. By grandfathering earlier standards, § 18-306(a)(3) effectively allows a permittee to vest in the standards that exist at the time the original permit application is submitted. Vested rights are lost if the system deteriorates or is not built.

Vallee's alternative reading, on the other hand, could lead to irrational results. State v. Wainwright, 2013 VT 120, ¶ 6, 195 Vt. 370 (courts are to avoid statutory interpretation that would "produce irrational and absurd results") (quoting In re Jones, 2009 VT 113, ¶ 7, 187 Vt. 1).

Vallee reads subpart (3) to require a state permit issued for an existing stormwater system to comply with all stormwater permits previously issued for that system, including federal permits such as the MS4 General Permit. Under this reading, however, subparts (1) and (2) would not require state permits for new development or redevelopment to conform with federal permits. For example, under Vallee's reading, if VTrans were to construct a brand new "Exit 16A" off I-89 in Colchester that would be subject to the MS4 General Permit, that exit would fall under § 18-306(a)(1), which *would not* require the Exit 16A state permit to conform to the MS4 General Permit. However, when the Exit 16A state permit expired, § 18-306(a)(3) *would* require the renewed state permit to conform to the MS4 General Permit. We can think of no rational reason why an initial permit would not have to comply with the MS4 General Permit, but a renewed permit would.

The definitions section of the Stormwater Management Rule also suggests that § 18-306(a)(3) is not intended to require conformity with federal stormwater permits. Subsection (3) requires in part that:

> Previously permitted **existing stormwater discharges** obtain an individual permit or coverage under a general permit that provides that **existing discharges** that have been previously authorized by the Secretary shall meet the treatment requirements in the most recently issued permit . . . .

§ 18-306(a)(3) (emphasis added).

The rule defines "existing stormwater discharge" as "a discharge of **regulated stormwater runoff** which first occurred prior to June 1, 2002 and that is subject to the permitting requirements of 10 V.S.A. Chapter 47." § 18-201(8) (emphasis added). "Regulated stormwater runoff" is in turn defined as "precipitation, snowmelt, and the material dissolved or suspended in precipitation and snowmelt that runs off impervious surfaces and discharges into surface waters **or into groundwater via infiltration**." § 18-201(17) (emphasis added).

By including discharges into groundwater, "regulated stormwater runoff" applies only to runoff regulated through the state permitting program. This is because the regulatory authority of the Clean Water Act (and NPDES permits) does not extend to discharges into groundwater via infiltration, see Cape Fear River Watch, Inc. v. Duke Energy Progress, Inc., 25 F. Supp. 3d 798, 810

(E.D.N.C. 2014). Where the rule refers to "[p]reviously permitted existing stormwater discharges," therefore, it is not referring to discharges permitted under the Clean Water Act.

### III. Conclusion

For these reasons, we conclude that Stormwater Management Rule § 18-306(a)(3) does not require the SW Permit to conform to the MS4 General Permit. Nor is the Court aware of any controlling law that would require such conformity. Amended Questions 11–18 are therefore not germane to the appeal now before the Court, and VTrans' and ANR's motions for summary judgment on those questions are **GRANTED**.

### Motion for Summary Judgment on Stormwater Appeal Amended Questions 9 and 10

Vallee moves, and VTrans cross-moves, for summary judgment on Amended Questions 9 and 10. CLF supports, and ANR opposes, Vallee's motion.

Amended Question 9 asks whether the permit should be limited to 4.779 acres of impervious surface within the project. Amended Question 10 asks what is the area of "redevelopment" and "development," as defined by the Vermont Stormwater Rules, within the project.

In moving for summary judgment on these Questions, Vallee argues that VTrans and ANR have not properly calculated the area of redevelopment for the Project.

### I. Undisputed Material Facts: Amended Questions 9 and 10

1. VTrans included a series of maps in its SW Permit application (Vallee Mot. Summ. J. Ex. 9) distinguishing different areas of the Project, including: 1) new impervious areas; 2) existing impervious areas that will be redeveloped; 3) existing impervious areas that will not be redeveloped; and 4) areas excluded from redevelopment because they remove or convert impervious surfaces (the Exhibit 9 map).

2. The Exhibit 9 map shows, at sheets 10 and 11, portions of Route 2/7 that are identified, via cross-hatching, as "impervious area treated by grass channels."

3. Most of this part of the roadway is also identified, via color-coding, as existing impervious areas that will not be redeveloped.

4. Running adjacent to this cross-hatched area are areas marked "stormwater grass channel."

5. As part of the Project, VTrans will remove the top layer of asphalt to a depth of 2 ¼ inches in the crosshatched area near the grass channels shown at sheets 10 and 11 on the Exhibit 9 map. VTrans will then repave the top layer of asphalt, adjusting the crown and roadway banking as needed.

6. Another map (Vallee Mot. Summ. J. Ex. 10) prepared by VTrans to show existing features in the Project area identifies and depicts "swales" in the Project area (Exhibit 10 map).

7. As part of the Project, VTrans will modify the swales marked on the Exhibit 10 map.

## II. Discussion: Amended Questions 9 and 10

Surface area is calculated in part based on whether existing impervious surface is being redeveloped. Here, the parties dispute whether the activities proposed at the cross-hatched sections of Route 2/7 on pages 10 and 11 of Exhibit 9 qualify as "redevelopment", and whether the activities qualify as coldplaning and resurfacing under the terms of the Stormwater Management Rule. VTrans' SW Permit application does not include the activities in this area as redevelopment. If VTrans was incorrect on this point, then its calculation of the Project's impervious surface area is also incorrect.

### a. Redevelopment

Under the 2011 Stormwater Management Rule,

> "Redevelopment" means the reconstruction of an impervious surface where an impervious surface currently exists, when such reconstruction involves substantial site grading, substantial subsurface excavation, or modification of existing stormwater conveyance such that the total of impervious surface to be constructed or reconstructed is greater than the minimum regulatory threshold. Redevelopment does not mean management activities on impervious surfaces, including any crack sealing, patching, coldplaning, resurfacing, paving a gravel road, reclaiming, or grading treatments used to maintain pavement, bridges and unpaved roads. Redevelopment does not include expansions.[11]

§ 18-201(18).[12]

---

[11] This definition can be found at http://dec.vermont.gov/sites/dec/files/documents/wsmd-sw-rule-unimpaired-2011-03-15_0.pdf. Note that a separate version of the 2011 Stormwater Management Rule—with an incomplete definition of "redevelopment"—can be found at

http://dec.vermont.gov/sites/dec/files/documents/wsmd-sw-rule-unimpaired-2011-03-15.pdf.

[12] See also 10 V.S.A. § 1264(b)(9) for a nearly identical definition of redevelopment.

The parties dispute how the exemption in this definition ("[r]edevelopment does not mean management activities on impervious surfaces, including . . .") should be applied.

As noted above, we construe regulations according to the rules of statutory construction, and with the overall goal of discerning the intent of the drafters. In re Williston Inn Grp., 2008 VT 47, ¶ 14, 183 Vt. 621 (citations omitted). When possible, we discern this intent by looking at the rule's plain language. Id. (citation omitted). If the plain language is ambiguous, we turn to other tools of statutory construction. Slocum, 154 Vt. at 478.

The definition begins by stating that redevelopment involves "the reconstruction of an impervious surface." § 18-201(18).

ANR maintains that "management activities on impervious surfaces" such as coldplaning and resurfacing, which are defined as not redevelopment, are also not "reconstruction of an impervious surface." Under this reading, the exemption applies categorically, from the beginning: if the activity involves coldplaning and resurfacing, then there is no "reconstruction of an impervious surface" and the activity is not redevelopment. Vallee argues that coldplaning and resurfacing are reconstruction, under that term's ordinary meaning, and that the exemption only applies to reconstruction that "involves substantial site grading [or] substantial subsurface excavation," not to reconstruction that involves "modification of existing stormwater conveyance."

ANR's interpretation of this definition, which is set out in its own regulations, is given "substantial deference." Lowell Mountain, 2014 VT 50, ¶ 15. In order for us to disregard this definition in favor of one put forward by Vallee or CLF, those parties would have to show that "ANR's interpretation is 'wholly irrational and unreasonable in relation to its intended purpose.'" Id. ¶ 17 (quoting Town of Killington, 2003 VT 88, ¶ 6, 176 Vt. 70).

We find ANR's definition to be neither irrational nor unreasonable. The definition's exception plainly states that "[r]edevelopment does not mean management activities on impervious surfaces, including . . . cold plaining [and] resurfacing . . . ." After listing these activities, the definition includes no qualifying clause, such as "except when these management activities are done in conjunction with modification of an existing stormwater conveyance." It is therefore reasonable to assume that coldplaning and resurfacing are simply not redevelopment.

Furthermore, the use of the terms "**reconstruction** of an impervious surface" and "**management activities** on impervious surfaces" suggests that management activities are different from reconstruction activities. See In re Miller, 2009 VT 36, ¶ 14, 185 Vt. 550 (courts assume that all language in a regulation was inserted for a purpose, and must not be rendered irrelevant or surplusage) (citations omitted).

The alternative reading of the exemption offered by Vallee and CLF would lead to confusing, if not illogical, outcomes. Wainwright, 2013 VT 120, ¶ 6 (courts are to avoid statutory interpretation that would "produce irrational and absurd results") (quotation omitted). For example, under their reading, modifying a pervious stormwater conveyance such as a grass swale by itself would not be redevelopment, because it would not involve reconstruction of an impervious surface. Sealing a crack in a road, by itself, would be reconstruction, but would be an exempt management activity that is not redevelopment. Sealing a crack in a road while simultaneously modifying an adjacent pervious stormwater conveyance, however, would be redevelopment. It is not clear why, if modifying a pervious conveyance alone is not significant enough to be considered redevelopment, and if sealing a crack alone is not redevelopment, these activities would become significant enough when paired to become redevelopment. Furthermore, under this reading a developer could avoid requirements associated with redevelopment by staggering these activities—modifying the pervious conveyance, then sealing the crack at a later point in time.

Even without any special deference, we conclude that ANR's definition of redevelopment is more logical than that offered by Vallee and CLF.

### b. Coldplaning and Resurfacing

The parties next dispute whether the proposed activities qualify as coldplaning and resurfacing.

This is a mixed question of law and fact. Sec'y, Vermont Agency of Nat. Res. v. Handy Family Enterprises, 163 Vt. 476, 482 (1995). The meaning of the terms coldplaning and resurfacing, as set out in the Stormwater Management Rule, is a legal question. Id. at 481–82; In re Application of Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 39, 199 Vt. 19. Whether the proposed

activities are coldplaning and resurfacing within the meaning of the Rule is a question of fact. Lathrop I, 2015 VT 49, ¶ 44.

We note that here, because the Stormwater Management Rule was promulgated by ANR, we give no deference to VTrans' interpretation of the Rule's terms. See Lowell Mountain, 2014 VT 50, ¶ 15.

According to VTrans, coldplaning is the process of removing a part of the surface of a paved area, typically to a depth of two to four inches, but can be more or less depending on the condition of the existing surface and material. VTrans submits that resurfacing is the process of replacing the surface of a paved area after coldplaning, and that resurfacing can include repaving, adjusting the roadway crown, or correcting the roadway banking (i.e. cross-slope), if these activities do not require excavation below the depth of the existing pavement.

Vallee appears to agree with the general concept of these terms as presented by VTrans, but disputes some details. First, Vallee asserts that coldplaning and resurfacing involves rebuilding the roadway exactly as it existed before, without changing the slope or crown. Second, Vallee appears to dispute any definition that differentiates these activities from other activities based on how deep into the surface the activity goes.[13]

The Stormwater Management Rule does not define coldplaning or resurfacing. Looking to the Rule's definition of redevelopment, however, we disagree with Vallee's assertion that coldplaning and resurfacing cannot be defined according to the depth of work done. Richards, 172 Vt. at 149. The definition frames coldplaning and resurfacing in a category of "management activities" that are not redevelopment. § 18-201(18). These are distinguished from "substantial site grading" and "substantial subsurface excavation," which are redevelopment. The definition therefore implies that coldplaning and resurfacing involves a less-substantial, or less deep, activity than other grading or extraction activities. This appears to support VTrans' depth-based reading of the terms.

---

[13] Vallee also questions whether Michael LaCroix is qualified to provide a definition, noting that his affidavit does not cite any accepted practices, manuals, or industry guidelines to support his opinion. Because the definition of these terms is not a factual question, Mr. LaCroix's affidavit and testimony are not necessary to resolve the issue.

In support of its position that coldplaning and resurfacing cannot involve adjusting the crown or banking., Vallee cites VTrans' 2011 Standard Specifications for Construction Book (Construction Book).[14] The Construction Book includes a section on coldplaning. Construction Book Section 201, at 2-46. The "General Construction Requirements" subsection for coldplaning explains that "[t]he bituminous surface shall be removed to the depth, width, grade, and typical cross-section as shown on the Plans or as directed by the Engineer. No variation from the typical cross-section of more than 3 mm (1/8 inch) will be allowed." Id. Section 210.03, at 2-46. Vallee appears to read this as barring crown or slope modifications. This section, however, appears only to bar variation from the "Plans." The Construction Book defines "Plans" as "the plans and drawings that show the location, character, sequence, and dimensions of the work, including layouts, profiles, cross-sections, and other details." Id. Section 101.02, at 1-12. VTrans offers that it will adjust crowns and cross sections according to the plans included in its SW Permit application. Doing so appears to comport with the "General Construction Standards" set out in the Construction Book.

The Construction Book contains no specific definition of "resurfacing." The plain meaning of resurfacing would not necessarily require a road to be resurfaced with the exact same crown and banking that it originally had.

Finally, Vallee's assertion that coldplaning and resurfacing must leave the crown and banking exactly as they were beforehand does not stand up to common sense. In re Grp. Five Investments CU Permit, 2014 VT 14, ¶ 23, 195 Vt. 625 ("We adopt a construction that implements the ordinance's legislative purpose and, in any event, will apply common sense.") (quoting In re Lashins, 174 Vt. 467, 469 (2002) (mem.)). The redevelopment definition discussed above refers to coldplaning and resurfacing as "maintenance activities." They are presumably done, therefore, to improve defects that develop as roads deteriorate. Anyone who has travelled our state is aware that roads in Vermont deteriorate over time, developing frost heaves, potholes, ruts, and other defects, which change the crown and banking to some degree. See, e.g., Bitumar USA Inc. v. Vermont Agency of Transp., No. 449-7-14 Wncv, slip op. at 3–4 (Vt. Super. Ct. Civ. Div. Jul. 31, 2014) (Toor, J.); In re Montpelier WWTF Discharge Permit, No. 22-2-08 Vtec, slip op. at

---

[14] Available at http://vtrans.vermont.gov/contract-admin/construction/2011-standard-specifications.

25

17–18 (Vt. Envtl. Ct. Jun. 30, 2009) (Durkin, J.). Under Vallee's interpretation, coldplaning and resurfacing would replace potholes, frost heaves, and other defects in order to maintain the "original" crown and banking. We can think of no circumstances under which this would make sense.

For these reasons, we conclude that coldplaning and resurfacing, as set out in the Stormwater Management Rule, can include modification of a road's crown or banking.

We next turn to whether, as a factual matter, the activities proposed at the cross-hatched sections of Route 2/7 on pages 10 and 11 of Exhibit 9 qualify as coldplaning and resurfacing. On this point, there does not appear to be any disputed issue of material fact. VTrans has explained, referencing plans submitted with its SW Permit, that the roadway in this area will be coldplaned to a depth of 2 ¼ inches and then resurfaced with adjustments to the crown and banking as needed. We conclude that this falls into the definition of coldplaning and resurfacing.

### III.    Conclusion

Because VTrans property identified the activities proposed at the cross-hatched sections of Route 2/7 on pages 10 and 11 of Exhibit 9 as not redevelopment, we **GRANT** VTrans' motion for summary judgement, and **DENY** Vallee's motion for summary judgment, on Amended Questions 9 and 10.

### Motion for Summary Judgment on Act 250 Appeal Questions 5, 6, and 11

Vallee moves, and VTrans cross-moves, for summary judgment on Vallee's Questions 5, 6, and 11 in the Act 250 appeal.

### I.    Whether the project complies with Criterion 1 and 1(B)

Vallee's Question 5 asks whether the Project satisfies Criterion 1, which prohibits undue water or air pollution. [15] 10 V.S.A. § 6086(a)(1). Vallee's Question 6 asks whether the Project satisfies the requirements of Criterion 1(B), which requires that a project will meet "any applicable Health and Environmental Conservation Department regulations regarding the

---

[15] Timberlake's Question 1 also asks whether the project complies with Criterion 1.

disposal of wastes, and will not involve the injection of waste materials or any harmful or toxic substances into ground water or wells." [16]   Id. § 6086(a)(1)(B).

In its motion for summary judgment, Vallee explains that it moved for judgment on these questions on the theory that if the Court were to grant Vallee's motion for judgment on SW Permit Amended Questions 9 and 10, then the Project's stormwater permit would no longer be valid and, without a stormwater permit, the Project would no longer satisfy Criteria 1 and 1(B). In a footnote, Vallee notes that the purported miscalculation of the area of redevelopment is not the only reason the Project fails to comply with these criteria, but is the reason that makes them ripe for summary judgment.

Because we have ruled against Vallee on SW Permit Amended Questions 9 and 10, its motion for summary judgment on Questions 5 and 6 in this docket is **DENIED**.

VTrans' motion does not address Questions 5 and 6.  Vallee, in its response, notes that VTrans did not provide a statement of undisputed facts to support judgment on Questions 5 and 6, and alleges that a number of issues remain to be determined before those questions can be answered.  We agree that the Questions are broad, and VTrans has not provided sufficient information at this time for the Court to rule in its favor.  VTrans' motion on Questions 5 and 6 is therefore **DENIED**.

### II. Whether the project complies with Criterion 10: Question 11

Vallee's Question 11 asks whether the project satisfies the requirements of Criterion 10, which requires projects to conform with duly adopted local or regional plans.[17]   10 V.S.A. § 6086(a)(10).

Vallee contends that the local and regional plans in this case require VTrans to build a sidewalk or multi-use path along the entire length of Route 2/7 within the Project area.  Vallee argues that the Project fails to meet this requirement because the Project does not include a sidewalk or multi-use path along Route 2/7 from Mountain View Drive north to the north end of the Project.  VTrans counters that the plans do not mandate sidewalks, but that the Project provides sidewalks anyway.

---

[16] Timberlake's Question 3 also asks whether the project complies with Criterion 1(B).

[17] Timberlake's Question 10 also asks whether the project complies with Criterion 10.

### a. Undisputed Material Facts: Question 11

1.      The Project includes sidewalks along both sides of US Route 2/7 from South Park Drive north through the Mountain View Drive intersection, along the south side of Lower Mountain View Drive to connect to the existing sidewalk there, and along the north side of Mountain View Drive to connect to a sidewalk that is to be built.

2.      The Project does not include sidewalks along Route 2/7 north from the Mountain View Drive intersection.

3.      The 2014 Colchester Town Plan (Town Plan) applies to the Project.

4.      The Town Plan includes twelve chapters, with each chapter broken down by subheadings. Most chapters conclude with the subheading "policies," which includes a numbered list of items. The prologue of the Town Plan explains that these "policies are recommended [to] implement the intent of this Plan."  Town Plan at 1.

5.      Chapter 10 of the Town Plan deals with transportation.  This chapter addresses sidewalks and multi-use paths under various subheadings.

6.      The Town Plan, Chapter 10, under the subheading "sidewalks," reads in part:

> Sidewalks provide for safe pedestrian circulation and are especially important in a residential community like Colchester. A sidewalk network is useful for transportation purposes only when it connects between residential, public, and commercial destinations. Sidewalks are important even in remote areas considering the School policy that children may be expected to walk up to 1/2 mile to a bus stop.

> With few exceptions, sidewalks are currently located mostly on local residential streets, having been installed by developers when subdivisions were built. Sidewalks continue to be built along our collector and arterial roadways. Over the past decade the Capital Transportation Plan has substantially expanded the Town's network of sidewalks with new sidewalks being added to West Lakeshore Drive, Blakely Road, and Malletts Bay Avenue as well as others. Additionally, new developments are required to include sidewalks and/or multiuse paths as well as provide easements for future pedestrian connections. These requirements are found in the Zoning Regulations, Subdivision Regulations, and Public Works Standards and Specifications.

Town Plan at 80.

7.      The Town Plan, Chapter 10, under the subheading "multiuse path," reads in part: "Multiuse paths support alternative modes of transportation, which are encouraged."  Town Plan at 80.

8.      The Town Plan, Chapter 10, under the subheading "policies," reads in part:

> 11. New subdivisions and other developments should provide for and encourage bicycle access, circulation and parking. Bicycle paths may be required to be built as part of subdivisions. Easements may be required to be dedicated to the Town for future bicycle paths.
>
> . . .
>
> 13. Sidewalks should be implemented as land use plans require. The need for sidewalks is particularly important on roads carrying heavy traffic volumes through developed areas including Exit 16.

Town Plan at 82 (footnotes omitted).

9.      The Town Plan, Chapter 2 "Land Use," under the subheading "Background," states that "Colchester has a unique diversity of land types and uses including: seasonal residential, residential, agricultural, recreational, commercial, industrial, institutional, and natural areas. It is important to preserve this diversity to maintain and enhance the character of the Town."  Town Plan at 8.

10.     The Town Plan then goes on to list "Land Use Categories."  Id.  One of these reads: "Business Use: This area is primarily within the Exit 16 core and serves as the dominant community commercial and industrial business center [and] support[s] large scale commercial development and /or manufacturing and distribution uses."  Town Plan at 9.

11.     The Town Plan, Chapter 2, under the subheading "Exit 16," reads:

> Exit 16 currently lacks many of the gateway distinctions necessary for a business center that also serves as a primary entrance to the community. The Town is currently working to curb infrastructure deficiencies in the area that include a lack of pedestrian and bicycle facilities as well as streetscape. These efforts will require the continued cooperation of the Chittenden County Regional Planning Commission and the State of Vermont as many of these improvements must occur in the State's right-of-way. It is expected that many of these deficiencies will be addressed through the larger planned transportation corridor improvements to Exit 16. These improvements will be important to the area's continued growth as a commercial and industrial center. New developments and redevelopments should positively contribute to these planned infrastructure improvements.

29

Traffic improvements that increase capacity within the area for the Town's economic growth will remain a high priority for the community.

Town Plan at 13.

12.    The Town Plan, Chapter 10, under the subheading "public roads," reads in part:

The Town's Public Works Standards and Specifications provide specific requirements for transportation infrastructure design and construction. These standards provide different designs for road widths based upon a variety of factors including function, average traffic, and land uses served. Pedestrian, street lighting, and stormwater options are also included in these standards. These regulations provide standards for traffic studies that are often required as part of the Zoning or Subdivision Regulations review. Sometimes, as a result of these processes, a development may be required to help implement improvements to the transportation infrastructure in order to offset adverse impacts caused by the development or facilitate full build out of the project.

Town Plan at 77.

13.    The Chittenden County Regional Planning Commission has enacted a regional plan (the ECOS Plan) that encompasses Colchester, including the Project area.

14.    ECOS Plan references the 2008 Bicycle and Pedestrian Plan.

### b.    Discussion: Question 11

Criterion 10 requires a project to conform with:

[A]ny duly adopted local or regional plan or capital program under 24 V.S.A. chapter 117. In making this finding, if the District Commission finds applicable provisions of the town plan to be ambiguous, the District Commission, for interpretive purposes, shall consider bylaws, but only to the extent that they implement and are consistent with those provisions, and need not consider any other evidence.

10 V.S.A. § 6086(a)(10).

In a Criterion 10 analysis we consider conformity with both the town plan and the regional plan, unless those plans conflict with each other.  24 V.S.A. § 4348(h)(1) ("the provisions of the regional plan shall be given effect to the extent that they are not in conflict with the provisions of a duly adopted municipal plan"); In re: Gizmo Realty/VKR Associates, LLC (Appeal of Act 250 Permit #3R0990), No. 199-9-07 Vtec, slip op. at 9–10 (Vt. Envtl. Ct. Apr. 30, 2008) (Durkin, J.) (after finding no conflict between local and regional plans, holding that the "Regional Plan must be given an effect equal to that given the Municipal Plan when considering whether this project

30

conforms with Criterion 10") (citing 24 V.S.A. § 4348(h)(1)).  If the regional and local plans conflict, then "the regional plan shall be given effect if it is demonstrated that the project under consideration in the proceedings would have a substantial regional impact."  24 V.S.A. § 4348(h)(2).  Here, the parties have not alleged that relevant provisions of the Town Plan and ECOS Plan conflict, and the Court has not identified any conflicting provisions.  We therefore consider conformity with both plans.

Regional and local plans are enforceable to the extent they are "sufficiently clear to give a person of ordinary intelligence a reasonable opportunity to know what is proscribed."  In re B & M Realty, LLC, 2016 VT 114, ¶ 34 (Oct 21, 2016) (quoting Brody v. Barasch, 155 Vt. 103, 110, (1990)).  Furthermore, even where plans are clear, they are only enforceable against a would-be developer through Criterion 10 to the extent that they set out mandatory requirements, as opposed to guidance, recommendations, or general policy.  Id. ¶ 35.  As with statutory interpretation, we construe provisions set out in local and regional plans to effect the intent of the drafters, relying on the plan's plain language where it is clear, and reading that plain language in context of the whole plan.  Id. ¶ 36.

**The Town Plan**

Vallee quotes excerpts from the Town Plan which, it contends, call for sidewalks in the section of the Project where no sidewalks are currently planned.  Most of these excerpts are couched in non-mandatory language; for example: "[t]he need for sidewalks is particularly important on roads carrying heavy traffic volumes through developed areas including Exit 16," (Town Plan at 82); "Sidewalks are important even in remote areas . . ." (id. at 80); "[m]ultiuse paths support alternative modes of transportation, which are encouraged," (id.); "[s]idewalks should be implemented as land use plans require. The need for sidewalks is particularly important on roads carrying heavy traffic volumes through developed areas including Exit 16," (id. at 82).  These are non-mandatory, because they state general objectives rather than specific requirements.  In re B & M, 2016 VT 114, ¶ 35 ("Mandatory language includes terms like "must" and "shall" and it sets forth a requirement rather than a recommendation.").  These passages therefore do not require VTrans to include sidewalks on any part of the Project.

One provision from the Town Plan, cited by Vallee, includes mandatory language:

With few exceptions, sidewalks are currently located mostly on local residential streets, having been installed by developers when subdivisions were built. Sidewalks continue to be built along our collector and arterial roadways. Over the past decade the Capital Transportation Plan has substantially expanded the Town's network of sidewalks with new sidewalks being added to West Lakeshore Drive, Blakely Road, and Malletts Bay Avenue as well as others. Additionally, **new developments are required to include sidewalks and/or multiuse paths as well as provide easements for future pedestrian connections**. These requirements are found in the Zoning Regulations, Subdivision Regulations, and Public Works Standards and Specifications.

Town Plan at 80 (emphasis added).

VTrans argues that "new developments" here refers to private and commercial developments, and not to projects such as the one here that involve developing roadways. Vallee disagrees, arguing that the Project qualifies as a new development.

The term "development" is not defined in the Town Plan. We therefore analyze this term in context. Richards, 172 Vt. at 149. The quoted passage is found in Chapter 10: Transportation, under the subheading "Sidewalks." One of the policies set out later in Chapter 10 states: "The Official Map delineates future transportation network improvements and other facilities. **Developments, road projects, and all other plans** shall take into consideration the Official Map and should implement the proposed improvements to the greatest extent possible." Town Plan at 82 (emphasis added). The use of separate terms for developments and road projects seems to support VTrans' argument that road projects and developments are different things. Miller, 2009 VT 36, ¶ 14. Elsewhere, however, the Town Plan refers to "[p]ublic and private development," which appears to contradict VTrans' assertion that "development" only refers to private sector activity. Town Plan at 42.

In other contexts, "development" can refer to roadway development. For example, the Project is considered a "development" for Act 250 purposes. The term "development" alone does not therefore automatically exclude roadways or limit itself to projects with residential or commercial purposes.

Assuming that the Project counts as a development solely for the purposes of analysis, the question is whether the sidewalks already included in the Project satisfy the requirement that "new developments are required to include sidewalks and/or multiuse paths."

As noted above, the Project includes sidewalks along both sides of US Route 2/7 from South Park Drive north through the Mountain View Drive intersection, along the south side of Lower Mountain View Drive to connect to the existing sidewalk there, and along the north side of Mountain View Drive to connect to a sidewalk that is to be built. The Project does not include sidewalks along Route 2/7 north from the Mountain View Drive intersection.

The Town Plan states that the requirements that new developments include sidewalks and/or multiuse paths "are found in the Zoning Regulations, Subdivision Regulations, and Public Works Standards and Specifications." Town Plan at 80. We note that normally, there is no need to consider conformity "with respect to the detailed requirements of all ordinances, regulations and policies adopted in furtherance of" a town plan in order to satisfy Criterion 10. 10 V.S.A. § 6086(a)(10); Horizon Dev. Corp., No. 4C0841-EB, Findings of Fact, Conclusions of Law, and Order at 29 (Vt. Envtl. Bd. Aug. 21, 1992). However, because the part of the Town Plan in question here specifically refers to the Zoning Regulations, Subdivision Regulations, and Public Works Standards and Specifications for guidance, we follow that reference in our analysis.

The Public Works Standards state that

> Multi-use paths are required on all Minor Collector, Commercial, Industrial and Residential streets that exist within the planning corridors identified in the Colchester Bicycle Pedestrian Plan and Official Map. Multi-use paths shall also be required on Residential streets outside these planning corridors when projected daily traffic volumes exceed one thousand (1,000) vehicles per day.

Public Works Standards at 16–17.[18] Vallee submits that Route 2/7 is a collector street and commercial corridor. VTrans disputes this, arguing that under its own classification system, Route 2/7 is a principal arterial street.

As to VTrans' argument, we note that its own classification system gives us little insight into how Colchester classifies its own roads in the Town Plan or related documents.

---

[18] While we turn to the Public Works Standards for guidance, we disagree with Vallee's assertion that mention of these Standards incorporates them into the Town Plan. Like many local plans, the Town Plan in this case references zoning ordinances. See, e.g., Town Plan at 8. We do not take those references to mean that the zoning ordinances are incorporated in the Town Plan, such that a Criterion 10 analysis would involve determining whether the project conforms to zoning ordinances. Likewise, we do not take mention of the Public Works Standards to mean that conformance with the entirety of those standards is part of a Criterion 10 analysis.

Vallee points to the Official Map, submitted as Exhibit 4, to support its argument. The map, however, makes no reference to "Minor Collector, Commercial, Industrial and Residential streets" or to "planning corridors." The map shows the section of Route 2/7 north from the Mountain View Drive intersection as an area for "proposed separated paths," but does not explain this designation. The Official Map also states: "All public and private roads, both proposed and existing, require sidewalks per the Town of Colchester Public Works Specifications and Standards as amended from time to time." This reference only circles us back to the Public Works Standards, which sends us back to the map, and so on.

In short, the sections of the Public Works Standards highlighted by Vallee, along with the Official Map, give us no guidance as to whether the section of Route 2/7 at issue here must have sidewalks.

Vallee also points to the Colchester Zoning Regulations, noting that they too require conformity with the Official Map, and that they incorporate the Colchester Code of Ordinances, which in turn incorporates the Public Works Specifications and Standards. Colchester Zoning Regulations at §§ 8.07, 2.19; Colchester Code of Ordinances § 14-6. Again, this gives us no insight into whether the Town Plan requires sidewalks on the section of Route 2/7 in question.

Vallee finally points to a provision in the Zoning Regulations, § 10.01(B)(6), under the chapter on subdivisions, which states that "[s]afe and convenient pedestrian circulation, including appropriate sidewalks, shall be provided on the site and its approaches." A similar requirement is set out in the Subdivision Regulations, at § 310. These provisions give no insight regarding whether Route 2/7 is a minor collector road. Because they relate to subdivisions, they are also unhelpful in determining whether the Town Plan requires sidewalks on Route 2/7.

Vallee offers an additional document—a grant fund report—as further evidence of the meaning of the Town Plan. We find this document to go beyond the scope of our review of Criterion 10 at this time. 10 V.S.A. § 6086(a)(10); Horizon Dev. Corp., No. 4C0841-EB at 29 (Aug. 21, 1992).

**The Regional Plan**

Vallee argues that the 2008 Bicycle and Pedestrian Plan requires sidewalks on Route 2/7, and that the 2008 Bicycle and Pedestrian Plan is incorporated into the ECOS Plan.

The ECOS Plan language cited by Vallee states that the 2008 Bicycle and Pedestrian Plan "identifies the vision, goals and objectives for these active transportation modes, assesses current conditions, and makes recommendations to sustain and improve the environment for walking and biking in the region." ECOS Plan at 166. We conclude that this language does not show an intent on the part of the ECOS Plan drafters to "incorporate" the 2008 Bicycle and Pedestrian Plan into the ECOS Plan such that a project being analyzed under Criterion 10 must also comply with the 2008 Bicycle and Pedestrian Plan. 10 V.S.A. § 6086(a)(10); Horizon Dev. Corp., No. 4C0841-EB at 29 (Aug. 21, 1992).[19]

We note that Vallee states in its statement of material facts ¶ 21 that the ECOS Plan was enacted in 2010. However, according to the Plan's cover, it was adopted June 19, 2013 and amended May 18, 2016. From the Plan itself, it is unclear what amendments were made in 2016. According to the Act 250 decision on appeal, VTrans filed its Act 250 application for the project on November 21, 2013. The Project would therefore vest in the local and regional plans in effect at that time. For the purposes of ruling on this motion, it is unnecessary to determine whether the ECOS Plan submitted by Vallee is the same as that which would be controlling, but we raise this issue to alert the parties that it appears the incorrect regional plan may have been filed.

### III. Conclusion

Vallee has failed to identify any part of the Town Plan or ECOS Plan that would require sidewalks on the section of Route 2/7 north from the Mountain View Drive intersection. Vallee's motion for summary judgment on its Question 11 is therefore **DENIED**.

VTrans has shown that nothing cited by the parties from either plan requires sidewalks on the section of road in question. However, this does not mean that there is nothing in the local or regional plan that would require sidewalks. We have not conducted an exhaustive analysis to

---

[19] Even if compliance with the 2008 Bicycle and Pedestrian Plan were required under Criterion 10, Vallee cites language from that Plan which is in the form of general guidance, and is not sufficiently specific to be considered mandatory to conclude that the plan requires sidewalks on Route 2/7 north of the Mountain View Drive intersection. E.g., under the heading "Timeline and Funding Priorities," "Roadway projects will be planned, designed and constructed under the assumption that they will be used by pedestrians and bicyclists (except where specifically prohibited such as on limited access highways);" and "Continue to ensure that bicycle and pedestrian components (sidewalks, pedestrian signals, on-road bicycle facilities, paths or reserved rights of way for paths) are included in all roadway and bridge projects, except where prohibited by law." 2008 Bicycle and Pedestrian Plan at 69–70.

resolve this question.  See Little v. Cox's Supermarkets, 71 F.3d 637, 641 (7th Cir. 1995).  Question 11 is very broad—the Town Plan is over 100 pages long, and the ECOS Plan over 200 pages.  Only part of the ECOS Plan has been submitted into the record.  As noted, it is not even clear that this is the version of the regional plan that applies to the Project.  The arguments presented by the parties are limited to compliance with these plans as to sidewalks and multi-use paths.  Even if we conclude that the Project complies with the local and regional plans as to sidewalks and multi-use paths, we are unable to conclude that the Project complies with every detail of the plans.  For these reasons, VTrans' cross motion for summary judgment on Question 11 is also **DENIED**.

## Order

In Docket No. 50-6-16 Vtec, the Stormwater Permit Appeal, ANR's and VTrans' motions for summary judgment on Amended Questions 1, 3, and 6–18 are **GRANTED**.

In Docket No. 169-12-16 Vtec, the Act 250 Permit Appeal, Vallee's motion, and VTrans' cross motion, for summary judgment on Vallee's Questions 5, 6, and 11 are **DENIED**.

See the enclosed notice setting a status conference.  Parties are directed to be prepared to address the scope of the remaining questions before the Court and how best to resolve them at this conference.

So Ordered.


Electronically signed on October 11, 2017 at 01:15 PM pursuant to V.R.E.F. 7(d).

_Tom Walsh_

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division

36